1
2
3
4
5
6

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

7    JUDITH G. GALLEGOS,                          )
8                            Plaintiff,           )    Case No. 2:07-cv-00722-LRH -GWF
                                                  )
9    vs.                                          )    **FINDINGS & RECOMMENDATIONS**
                                                  )
10   MICHAEL J. ASTRUE, COMMISSIONER OF           )    **Plaintiff's Motion for Reversal - #11**
     SOCIAL SECURITY,                             )
11                                                )    **Defendant's Motion to Affirm - #16**
                             Defendant.           )
12   _____)

13          This matter is before the Court on Plaintiff's Motion for Reversal (#11), filed January 22, 2008;

14   Defendant's Motion to Affirm and in Opposition to Plaintiff's Motion for Reversal and/or Remand

15   (#16/18), filed on April 1, 2008; and Plaintiff's Reply to Defendant's Motion to Affirm and in

16   Opposition to Plaintiff's Motion for Reversal and/or Remand (#17/19), filed on April 21, 2008.

17   <u>**PROCEDURAL BACKGROUND**</u>

18          Judith Gallegos alleges that she became disabled on March 5, 2004.  (AR 22)  On May 20, 2004,

19   Ms. Gallegos filed an application for Social Security disability insurance benefits.  *Id.*  Her application

20   was denied on September 10, 2004.  (AR 44-47)  On September 15, 2004, she filed for reconsideration,

21   which was subsequently denied on April 20, 2005.  (AR 48-50)  Ms. Gallegos requested a hearing

22   before an Administrative Law Judge ("ALJ") which was conducted by video teleconference on February

23   29, 2006.  Ms. Gallegos testified at the hearing regarding her physical and mental condition and

24   inability to work.  A vocational rehabilitation expert also testified regarding her ability to perform other

25   available work based on a hypothetical regarding her residual functional capacity.  (AR 22, 386-418)

26   On April 28, 2006, the ALJ concluded that Ms. Gallegos was not disabled as defined in the Social

27   Security Act and Regulations.  (AR 30)  The ALJ's decision was affirmed by the Appeals Council on

28   May 14, 2007.  (AR 6-8)

1    Ms. Gallegos filed this instant action requesting that the Court either remand this case with

2  instructions to award benefits, or alternatively, remand this case with instructions to the Commissioner

3  of Social Security ("Commissioner") to: (1) accept the opinions of her treating doctors as true; (2)

4  accept Ms. Gallegos' subjective complaint as true; (3) properly evaluate her fibromyalgia in accordance

5  with the Commissioner's policies; and (4) issue a new decision, consistent with applicable case law,

6  rulings and regulations.  (Plaintiff's Motion for Reversal (#11), p. 29)

7                            **SUMMARY OF MEDICAL EVIDENCE AND TESTIMONY**

8    Ms. Gallegos is a 58 year old woman with a high school education.  (AR 23)  She was employed

9  as a telephone operator by Sprint and its predecessors in Las Vegas, Nevada from 1974 until March 5,

10  2004 when she ceased working due to alleged disability.  Ms. Gallegos testified at the February 28,

11  2006 hearing that she had suffered from pain due to fibromyalgia for approximately six to eight years

12  which made it difficult for her to work.  She indicated that her pain got extremely bad in the last two or

13  three months before she completely ceased working.  (AR 390)  She testified that the principal aspect of

14  her employment which aggravated her pain was  the requirement that she sit for extended periods of

15  time without breaks to walk or move around, or possibly lie down.  (AR 391)  She also testified that she

16  was having difficulty performing her duties because she would forget what the customers told her and

17  would have to have them repeat their requests.  (AR 390)  She testified that prior to March 5, 2004, she

18  took days off or left work shortly after she arrived.  She also indicated that her supervisors suggested to

19  her that she was no longer able to perform her duties because of her condition.  (AR 391)

20    Dr. Dean Mondell, M.D. of Rehabilitation Associates of Nevada evaluated Ms. Gallegos  on

21  April 25, 2002 for complaints associated with fibromyalgia.  (AR 170-172)  Ms. Gallegos told Dr.

22  Mondell that she developed the onset of fibromyalgia symptoms approximately three or four years

23  before she saw him.  She had undergone acupuncture and exercise therapy which made her symptoms

24  worse, and it took six months after that treatment to return to her baseline condition.  (AR 170)  She

25  stated that approximately a month before her visit she was feeling terrible, but that she had gone on a

26  diet and was feeling much better.  She stated that she was walking 30 minutes per day.  Her biggest

27  problem was itching.  She also reported difficulty sleeping and stated that some nights she could not

28  sleep at all and on other nights she could not stay asleep.  Ms. Gallegos reported pain in the neck, upper

2

1    back, shoulders, mid-back, legs and knees.  She experienced numbness and tingling in the past, but

2    none at the time of her evaluation.  Fatigue was not a big problem for her.  (AR 170)  She also had a

3    history of migraine headaches, which were now worse due to a change in the lighting at work.  (AR

4    171)

5          Dr. Mondell indicated that Ms. Gallegos had normal or mild restrictions in her ranges of motion,

6    reflexes and muscle strength.  She had point tenderness in her cervical spine, upper back, low back and

7    knees.  Dr. Mondell's diagnosis was that Ms. Gallegos had fibromyalgia, musculoligamentous strain

8    and pain in the bilateral neck, upper back, mid back, low back, arms, legs and anterior chest, migraine

9    headaches, restless leg syndrome, insomnia and itching.  (AR 172)  He prescribed medications and

10   physical therapy including an exercise program.  Dr. Mondell stated that Ms. Gallegos would continue

11   working without restriction and he would continue to re-evaluate her.  *Id.*

12          Between April 25, 2002 and November 5, 2003, Dr. Mondell re-evaluated Ms. Gallegos'

13   condition every few months.  (AR 131-172)  In general, Ms. Gallegos' symptoms remained consistent,

14   but waxed and waned over this period.  On November 5, 2003, four months before she ceased working,

15   Ms. Gallegos reported that she was feeling slightly better as compared to her prior visit in October, and

16   that she was better in some ways as compared to her first visit.  She reported that the Dilaudid

17   medication made her itch, although it helped her pain tremendously.  She rated her pain as a 6 on a scale

18   of 1-10.  She reported that her sleep had been poor, but her was appetite good.  She also reported severe

19   depression and anxiety.  In this connection, she stated that there had been talk of more lay-offs at work,

20   which was making her anxious.  Dr. Mondell noted that she was working full time without restrictions.

21   (AR 131)

22          Prior to November 2003, Ms. Gallegos was also under the care of Dr. Donald Wingard at

23   Galleria Urgent Care.  On November 19, 2003, Ms. Gallegos reported to Dr. Wingard that she had leg

24   and back pain, with pain shooting down the back of her legs.  She indicated that she was taking Tylenol

25   with codeine and that she could not sleep at night.  She stated that the burning pain felt different than

26   her fibromyalgia pain, although Dr. Mondell apparently thought her pain was secondary to

27   fibromyalgia.  Ms. Gallegos wanted a second opinion.  (AR 202)  The doctor's notes indicate a history

28   of "sciatica." The note also indicated that x-rays showed spondylolithesis at L4-5 of the lumbar spine

1   and that she had decreased range of motion in the lumbar spine.  Dr. Wingard's impression was that her

2   pain was due to a questionable radiculopathy or fibromyalgia.  He referred her for an MRI.  *Id.*

3        A November 19, 2003 lumbar spine x-ray report by Dr. William Orrison indicated that there was

4   Grade 1 spondylolithesis of L4 on L5.  The intervertebral disk spaces were well preserved.  There was

5   no evidence of fracture or spondylolysis.  There was facet sclerosis most marked at L4-5 and L5-S1.

6   Dr. Orrison's x-ray impression was degenerative changes of the lumbosacral spine.  (AR 212)  A

7   November 24, 2004 MRI report by Dr. Orrison also indicated that Ms. Gallegos had a Grade 1

8   spondylolithesis of L4 on L5 without evidence of spondylolysis.  There was no abnormal signal

9   intensity identified within the vertebral bodies or the region of the conus medullaris.  The MRI report

10  also noted degenerative arthritic changes at several levels of the lumbar spine.  Dr. Orrison's

11  conclusions were (1) L2-3 and L3-4 mild spinal stenosis, (2) L4-5 Grade 1 spondylolithesis with mild to

12  moderate spinal stenosis and posterior disc bulge with annular tear, (3)  L5-S1 disc protrusion with

13  annular tear, and (4) multilevel facet arthropathy and bilateral neural foraminal narrowing.  (AR 173-

14  174)

15       Dr. Wingard saw Ms. Gallegos on December 9, 2003.  His impression was that she had lumbar

16  disc disease and fibromyalgia and he referred her for pain management.  (AR 197)  On March 5, 2004,

17  Ms. Gallegos complained to Dr. Wingard of right leg pain and swelling.  She reported that she could not

18  walk upstairs and that she was feeling better while off work.  Dr. Wingard placed her on off work status

19  until April 5, 2008 and referred her for physical therapy.  (AR 184)  On April 2, 2004, she reported that

20  she still had right leg pain, was experiencing a lot of pain and could not sit for any length of time.  Dr.

21  Wingard continued her on off work status and referred her for a neurosurgical evaluation.  (AR 182)

22       Ms. Gallegos saw Dr. Jason Garber, a neurologist or neurosurgeon on April 6, 2004.  He

23  reported to Dr. Wingard that he was ordering some nerve blocks and would try conservative treatment

24  for her lumbar spine pain and right lower extremity radiculopathy.  (AR 175-176) Ms. Gallegos again

25  saw Dr. Wingard on April 30, 2004 with continued complaints of low back and right leg pain and

26  advised that she had a pain management consultation scheduled for May 3, 2004.  Dr. Wingard

27  continued her on off-work status until June 7, 2004.  (AR 180)  Ms. Gallegos saw a pain management

28  physician, Dr. Raimundo Leon, on May 3, 2004.  (AR 222-224)  He performed an initial lumbar nerve

1   block on May 11, 2004.  (AR 219-220)  On June 2, 2004, Ms. Gallegos reported to Dr. Wingard that the

2   first epidural injection helped for a few days and that she was scheduled for a second epidural injection

3   on June 8th.  She again reported that she could not sit for extended periods.  Dr. Wingard continued her

4   on off-work status until August 2, 2004.  (AR 179)

5        Ms. Gallegos underwent the second nerve block on June 8, 2008.  (AR 213-214)  Dr. Leon

6   reported on July 5, 2004 that Ms. Gallegos had low back pain and bilateral extremity pain.  She reported

7   a complete resolution of her pain at the time of the second nerve block procedure, but the pain returned

8   within 24 hours to its same location and was of greater intensity.  Ms. Gallegos reported that her pain

9   was 10 over 10, the majority of which was located in the left knee.  Dr. Leon stated that there was no

10  further intervention procedures he could provide to assist her pain symptomatology and that he was

11  referring her back to Dr. Garber.  He also recommended that Ms. Gallegos' knee be evaluated by an

12  orthopedic surgeon.  (AR 213)

13       The Bureau of Disability Adjudication referred Ms. Gallegos for a mental evaluation by Dr.

14  James D. Doornink, a psychologist on July 26, 2004.  (AR 267-270)  According to Dr. Doornink's

15  report, Ms. Gallegos stated that she was unable to work mainly because of pain.  She stated that she had

16  fibromyalgia for the past eight years and that it was getting worse.  She reported mental difficulties in

17  dealing with customers and that she got very tired during the last several months she worked.  (AR 267)

18  Under the Daily Activities Section, Dr. Doornink noted that Ms. Gallegos reported that she did not

19  sleep well, but it was better now that she was not working.  She was able to take care of her own

20  hygiene.  She visited with friends in town but did not go out much, other than occasionally to lunch.

21  She cooked and shopped for herself, but did not attend church or belong to other organizations.  Ms.

22  Gallegos reported that her hobby was playing on the computer, but that she could only do that for 10 to

23  15 minutes without her pain becoming bad.  She also stated that her memory was worse when she was

24  working. (AR 269)

25       Dr. Doornink noted that (1) Ms. Gallegos did not have delusional thinking; (2) her

26  concentration and short-term memory had very minor deficits; (3) her fund of information appeared

27  intact; (4) her vocabulary appeared intact; (5) her ability to engage in abstract thinking was intact; (6)

28  her common sense reasoning and judgment in social situations appeared to be mildly to moderately

1   impaired; and (7) her daily activities appear mildly to moderately limited.  (AR 268-69)  In regard to

2   Ms. Gallegos' Test of Memory/Malingering, Dr. Doornink noted that Ms. Gallegos achieved perfect

3   scores in all of her trials, which suggested that there was very little, if any, evidence that Ms. Gallegos

4   was "making her memory deficits worse than they actually are."  (AR 269)

5         The Bureau of Disability Adjudication Services also referred Ms. Gallegos for a medical

6   evaluation by Dr. Rito B. Maningo on August 6, 2004.  (AR 271-80)  According to the History of

7   Present Illness, Ms. Gallegos told Dr. Maningo that she had suffered from chronic back pain for the past

8   two years and that an MRI revealed evidence of spinal stenosis.  She also reported an eight year history

9   of fibromyalgia and complained mostly of pains in the arms, neck and feet.  She also reported a history

10  of chronic depression, chronic migraine headaches up to 8-9 a week which lasted for up to 2-3 hours,

11  but only 2-15 minutes when she took her migraine pill on time.  (AR 271)

12        According to Dr. Maningo's report:

13            She claims that she can walk no more than 2 blocks, she can sit down in a
             chair no more than 30 minutes, she can stand on her two feet no more
14            than 15 minutes, and she can drive long distances.  Today she drove to
             our office and walked inside unassisted.  Traveling does not bother her.
15            (AR 272)

16        Dr. Maningo noted that Ms. Gallegos' hips, knees and ankles were examined with no evidence

17  of deformities, contracture, crepitus, or acute inflammatory conditions.  (AR 274)  In regard to Ms.

18  Gallegos' back and spine, Dr. Maningo noted that there was no evidence of kyphosis, scoliosis, or

19  paravertebral muscle spasms.  *Id.*  Dr. Maningo stated that Ms. Gallegos had a normal gait, normal

20  weight-bearing, and normal posture with no evidence of foot drop or shuffling.  *Id.*  Dr. Maningo noted

21  that Ms. Gallegos' memory and ability to concentrate were intact.  (AR 275)  He further noted that Ms.

22  Gallegos had the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds

23  frequently.  (AR 277)  She had the ability to stand and/or walk about 6 hours in an 8-hour workday and

24  to sit for 6 hours in an 8-hour workday in which standard breaks and lunch period would provide

25  sufficient relief, and that an assistive device was not medically necessary for ambulation.  *Id.*  Dr.

26  Maningo also noted that Ms. Gallegos had the postural capacity to frequently climb ramps and stairs,

27  balance, stoop/bend, kneel, crouch/squat, and crawl.  *Id.*  Dr. Maningo noted that Ms. Gallegos was not

28  limited in reaching, fingering, handling objects, hearing, seeing, speaking, and traveling.  (AR 278)  Dr.

1   Maningo also noted that Ms. Gallegos did not have any environmental limitations.  *Id.*  Dr. Maningo's

2   report stated that Ms. Gallegos had the residual functional capacity to perform light duty work.[1]

3        On August 13, 2004, Ms. Gallegos asked Dr. Wingard for a referral to see Dr. McBride at

4   UCLA regarding her lumbar spine condition and also requested a new MRI.  (AR 299)  On August 18,

5   2004, a follow-up MRI of Ms. Gallegos' lumbar spine was obtained.  Dr. Orrison stated that there was

6   not a significant interval change in Ms. Gallegos' spine as compared to the previous MRI in November

7   2003.  (AR 313)  On August 23, 2004, Ms. Gallegos reported to Dr. Wingard that the left knee pain

8   which she had had for two months was still bothering her and that she was scheduled to go to UCLA in

9   September.  (AR 298)

10       On September 7, 2004, a State Agency examiner also performed a residual functional

11  assessment of Ms. Gallegos.  The examiner noted that Ms. Gallegos had the residual functional capacity

12  to lift and carry 20 pounds occasionally and 10 pounds frequently.  (AR 322)  Ms. Gallegos had the

13  ability to stand and/or walk about 4 hours in an 8-hour workday and to sit for 6 hours in an 8-hour

14  workday.  *Id.*  Ms. Gallegos' push and/or pull capabilities were unlimited.  *Id.*  Ms. Gallegos had the

15  postural capacity to frequently climb ramps and stairs, balance, stoop/bend, kneel, crouch/squat, and

16  crawl.  *Id.*  Ms. Gallegos did not have any manipulative, visual, communicative, or environmental

17  limitations.  (AR 324-26)  The examiner noted that his/her evaluation was different from the previous

18  evaluation by Dr. Maningo in that Ms. Gallegos' ability to stand and/or walk was reduced from 6 hours

19  to 4 hours due to her fibromyalgia and obesity.  (AR 327)  The assessment was reviewed and affirmed

20  by Dr. Randall Hays on April 15, 2005.  (AR 328)

21       On September 7, 2004, Ms. Gallegos was evaluated for a mood disorder.  (AR 282-95)  It was

22

23  _____

24       [1]Ms. Gallegos' counsel, however, points to a note by an agency reviewer who stated:

25       "before adopting Dr. Maningo's mss for limited light (see my discussion
         8/12/4) I reviewed 02-00-0D. 6/8/00 which instructs us that CE's are not
26       always as helpful in fibromyalgia cases.  See please my notes of 7/19/4
         next.  Clmts physical adl's seem very restricted and she has a history of
27       heavy pain meds.  I'm not sure adopting the light rfc is appropriate and
         would like your opinion as to the fibromyalgia.  (AR 337)
28

7

1   noted that Ms. Gallegos' mood disorder was not severe, and there was insufficient evidence to

2   substantiate the presence of a disorder.  This evaluation was affirmed by Dr. R.J. Milan on April 15,

3   2005. (AR 282, 285)

4          On October 26, 2004, Dr. Duncan McBride performed a right L4-5 hemilaminoty, medial

5   facetectomy and foraminotomy surgery on Ms. Gallegos.  (AR 344-345)  On November 8, 2004, Ms.

6   Gallegos met with Dr. Duncan McBride for her first postoperative visit.  (AR 343)  She reported that

7   her legs still hurt when sitting, her lower back was not that painful, and there was a notable reduction in

8   her pain medication usage since the surgery.  *Id.*  Ms. Gallegos further reported that she was doing a lot

9   of walking and was walking several miles which she was not able to do prior to the surgery.  Ms.

10  Gallegos still reported pain in both legs.  *Id.*  Dr. McBride stated that there had been some improvement

11  since the surgery, but that she was not pain free.  He suggested to Ms. Gallegos that she needed to wait a

12  few months for the operation to achieve a complete benefit to her.  *Id.*  He also advised her that if

13  symptoms of severe pain and numbness in her legs from sitting continue, that she may ultimately need a

14  fusion at the level of her spondylolithesis.  Dr. McBride scheduled Ms. Gallegos for a follow-up visit in

15  a couple of months.  *Id.*

16         Ms. Gallegos was seen by Dr. Wingard on November 23, 2004.  (AR 296)  Dr. Wingard noted

17  that Ms. Gallegos had surgery and thinks she is "some better."  The record also indicates that Ms.

18  Gallegos was told that she could not work at a desk job because she cannot sit for extended periods and

19  has to lie down.  Dr. Wingard stated that she was "probably disabled for any work."

20         Dr. McBride again saw Ms. Gallegos on February 14, 2005.  He noted that he had previously

21  sent a letter to her insurance carrier in November stating that she might be able to return to work in

22  March 2005.  This statement was based on his interview with her in November 2004.  Ms. Gallegos was

23  now reporting, however, that her leg pain had become quite severe in recent months which was

24  manifested mainly by an intermittent burning sensation in the right leg that came on after sitting.  (AR

25  341)  Dr. McBride noted that she had significant spondylolithesis and instability brought on by sitting

26  and standing, which may have caused intermittent nerve damage.  *Id.*  He stated that Ms. Gallegos was

27  "certainly disabled from her customary work as a telephone operator until this gets straightened out,"

28  and if "her limited sitting with radiculopathy and is untreated, then she certainly would not be able to

1    continue as a telephone operator, sitting for 7-1/2 hours each day." *Id.*

2         Dr. McBride performed a physical ability assessment of Ms. Gallegos on April 8, 2005.  (AR

3    348-49)  He stated that Ms. Gallegos could occasionally sit, stand, walk and reach for 2-1/2 hours in an

4    8 hour workday.  (AR 348)  He also stated that she could lift, carry, push and pull 10 pounds

5    occasionally.[2]  (AR 348-49)

6         At some point Ms. Gallegos moved, temporarily, to Virginia to care for an uncle who suffered

7    from Alzheimer's disease.  Ms. Gallegos testified at the hearing that she was the only family member

8    who could communicate with her uncle and her presence had a calming effect on him.  Ms. Gallegos

9    also testified, however, that she did not assist in the physical care of her uncle.  (AR 392)  She testified

10   that she traveled from Las Vegas to Virginia by airplane.  After spending some time in Virginia, she

11   again returned to Las Vegas by airplane.  Because her uncle became agitated when she left, she returned

12   to Virginia, again by airplane.  She testified at the hearing that she was planning to return permanently

13   to Las Vegas because her son was being released from prison and she needed to provide a residence for

14   him to stay.  She also stated that her uncle's Alzheimer's disease was worsening and there was

15   discussion about placing him in a nursing facility.  (AR 392-393, 405)  Ms. Gallegos also testified that

16   "[t]hose plane trips kill me" and she made sure to get an aisle seat so that she could get up and move

17   around.  She also testified that she uses a wheelchair in the Las Vegas airport because of the long

18   distance between the gate and the terminal.  She testified, however, that she does not otherwise need a

19   wheelchair.  (AR 393-394)

20        On April 4, 2005, Ms. Gallegos was seen by Ramon Motos, M.D. a family care physician in

21   Virginia.  (AR 66)  He noted that Ms. Gallegos had recently relocated to Virginia from Las Vegas and

22   that she had multiple complaints of recurring pain of the left knee, back pain, fibromyalgia, anxiety

23   disorder, hypertension, etc.  She also complained of migraine headaches but indicated that she was

---

25   [2]This physical ability assessment appears to have been performed at the request of Ms. Gallegos'

26   insurer.  Other records indicate that Ms. Gallegos was in Virginia on the date Dr. McBride filled out the
     assessment form.  *See* AR 66.  Dr. McBride's physical ability assessment noted that Ms. Gallegos could

27   lift 11 to 100+ pounds occasionally.  In light of Ms. Gallegos' other physical limitations, this assessment

28   appears erroneous.

1   doing fine with this problem.  *Id.*  On physical examination, he noted swelling of the left knee with

2   tenderness, and range of motion, no muscle spasm.  (AR 67)  He prescribed an x-ray of the left knee and

3   continued her on her medications.  *Id.*  Dr. Motos saw Ms. Gallegos again on April 22, 2005 at which

4   time she complained of difficulty sleeping and that she still had pain in the left knee and shoulder.  (AR

5   65)  He prescribed additional medication and indicated that an MRI or x-ray of the knee would be

6   obtained if there was no improvement.  *Id.*  Dr. Motos next saw Ms. Gallegos on June 15, 2005 at

7   which time she was complaining of left knee pain, that she still had problems with sleep in spite of the

8   medication he prescribed and had urinary incontinence.  (AR 64)

9          While in Virginia, Ms. Gallegos was also seen and treated by Dr. Faisal W. Chaudhry and a

10  nurse practitioner on his staff.  In his October 6, 2005 office visit report, Dr. Chaudhry noted Ms.

11  Gallegos' history of spinal stenosis, LS DJD, and lumbar radiculopathy.  He also noted that she had a

12  history of hypertension, generalized fibromyalgia, and restless leg syndrome.  She also had a history of

13  hyperlipidemia.  (AR 360)  Dr. Chaudhry's initial note did not discuss Ms. Gallegos' subjective

14  symptoms on that date.  Under his objective physical examination, however, he noted that she had

15  "[p]aravertebral muscle spasm in the LS spine."  *Id.*  Dr. Chaudhry prescribed some medications, and

16  indicated that previously prescribed medications would be continued or discontinued.  He also stated

17  that a treatment plan was discussed in detail with the patient and that further management would depend

18  on her progress.  (AR 361)  Ms. Gallegos was seen by the nurse practitioner two days later at which

19  time she had two leg abrasions that she felt might be infected.  She advised that she bumped her leg

20  several days previous and the abrasions had worsened.  She also stated that Dr. Chaudhry had taken her

21  off Klonopin which was the only medication that relieved her itching and stated that her legs were

22  itching constantly.  (AR 359)  She was again seen by the nurse practitioner on October 20, 2005,

23  complaining that she was still experiencing itching, that another medication was making her very sleepy

24  and that a third medication was helping, but not completely taking away the pain in her legs.  Under the

25  treatment plan, it was indicated that Ms. Gallegos would restart Klonopin, she was instructed to stop

26  taking the medication that made her sleepy and her pain medication was increased in dosage.  (AR 357-

27  358)  Dr. Chaudhry saw her again on October 24, 2005.  On that date, she complained of a sharp

28  shooting pain in the left lower extremity.  (AR 356)  Dr. Chaudhry's assessment was LS DJD, left leg

1  radiculitis, fibromyalgia and hypertension.  He again prescribed medication and scheduled her for

2  follow-up.  *Id.*

3      An MRI was performed on Ms. Gallegos' lumbar spine on October 31, 2005.  The opinion of

4  the MRI examiner was that Ms. Gallegos had Grade 1 degenerative spondylolithesis at L4-L5 and that

5  she had a previous right L4 hemilaminotomy with no evidence of recurrent disc extrusion or significant

6  epidural scar formation.  (AR 355)  She was again seen by Dr. Chaudhry on November 9, 2005 at which

7  time he noted a history of peripheral neuropathy and low back pain.  Ms. Gallegos complained of

8  intermittent episodes of a burning sensation in the feet and that she had vitamin B 12 deficiency.  (AR

9  354)

10     Ms. Gallegos was referred to Dr. Mrugendra R. Patel for nerve conduction studies and EMG

11 examination in regard to her continuing complaints of radiating symptoms into the lower extremities.

12 (AR 372)  Dr. Patel's November 29, 2005 report stated that the nerve conduction study in both lower

13 extremities was normal.  The EMG study of both low extremities was also normal, and Dr. Patel stated

14 that "[a]t present, there is no electrodiagnostc evidence of generalized neuropathy or lumbosacral

15 radiculopathy on either side."  (AR 372)  Dr. Patel also conducted a neurological consultation-

16 examination of Ms. Gallegos on November 29, 2005.  (AR 369-371)  He noted that she had been having

17 intermittent symptoms of burning pain, tingling sensations, and numbness in both feet for several

18 months and that these symptoms were gradually getting worse.  (AR 369)  His impression/diagnosis

19 was as follows:

20     1.  Chronic lower back pain with radicular symptoms of pain and
         paresthesis in both lower extremities musculoskeletal in nature from
21       chronic degenerative lumbar disk disease.  At present, she does not have
         any electrodiagnostic evidence of generalized neuropathy or lumbosacral
22       radiculopathy on either side.

23     2.  Chronic pain and paresthesias in feet and lower legs probably
         secondary to either osteoarthritis, fibromyalgia syndrome, chronic
24       degenerative lumbar disk disease or restless leg syndrome.

25     3.  Probable restless leg syndrome.

26     4.  Chronic polyarthraigla.

27     5.  Essential hypertension.

28     6.  GERD

11

7.  Hypothyrodism.

8. Chronic anxiety-depressive disorder.  (AR 370)

Under his treatment plan, Dr. Patel further stated:  "I discussed at length with her and explained to her that the discomforting symptoms in her feet and legs may very well be either from restless leg syndrome or fibromyalgia syndrome."  Dr. Patel referred Ms. Gallegos back to Dr. Chaudhry for continued management of her symptoms.  (AR 371)

At the February 28, 2006 hearing, Ms. Gallegos testified that after she had back surgery in October 2004, Dr. McBride told her that she could not go back to work unless she found a job that would allow her to get up and move around.  (AR 395-96)  Ms. Gallegos testified that Sprint would not allow her to work under those conditions.  *Id.*  When asked by her attorney why she could not return to her past work as a telephone operator, Ms. Gallegos stated:  "Because I can't sit all day."  (AR 398) She testified that she could sit for a half an hour to one hour.  *Id.*  She also testified that she could not stand very long:  "I'd say 15 minutes, possibly a half hour if it's a good day."  *Id.*   The ALJ questioned Ms. Gallegos about the statement in Dr. McBride's November 8, 2004 initial post-surgery report in which she reportedly told him that she was "walking several miles a week."  Ms. Gallegos responded that after the surgery, she stayed at her brother-in-law's home and walked around the house because she had been told that in order to get over the back surgery she needed to walk.  She stated that she did not walk several miles and did not believe she made that statement to Dr. McBride.  (AR 399-400)  She also stated that Dr. McBride told her that she could or might be able to return to work in March 2005. *Id.*

Under further questioning by the ALJ, Ms. Gallegos testified that she still drives a car, but only goes short distances.  (AR 404)  Ms. Gallegos further testified that she goes out to eat occasionally in Las Vegas at restaurants located near where she lives.  (AR 405)  She testified that she went to a restaurant only one time while she was staying in Virginia.  *Id.*

The ALJ also asked Ms. Gallegos how long she can use a computer.  She testified:

> About maybe, I get on about 15 minutes and then I just, I can't sit
> anymore and then I get up and maybe a couple of hours, I might get back
> on it. I'd say over a period of a day, maybe a couple of hours.  (AR 405)

# DISCUSSION

## I.      Standard of Review.

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991)  The Court must look to the record as a whole and consider adverse and supporting evidence.  The court may not affirm simply by isolating a specific quantum of supporting evidence.  *Id. See also Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  "Substantial evidence is defined as 'more than a scintilla but less than a preponderance.'" *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (*quoting Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).  Hence, where the evidence may be open to more than one rational interpretation, the court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).

## II.      Whether the ALJ's Decision Is Supported by Substantial Evidence.

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The claimant carries the burden with respect to steps one through four.  *Tackett*, 180 F.3d at 1098.  If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  Under the first step, the Secretary determines whether a claimant is currently engaged in substantial gainful activity.  *Id.* § 416.920(b).  If so, the claimant is not disabled.  *Id*. § 404.1520(b).  Second, the Secretary determines whether the claimant's impairment is severe.  *Id.* § 416.920(c).  Again, if the impairment is not severe, the claimant is not disabled.  *Id*. § 404.152(c).  Third, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1.  The claimant will be found disabled if the claimant's impairment meets or equals a listed impairment.  *Id*. § 404.1520(d).  If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work.  *Id*. § 416.920(e).  If the claimant can engage in past relevant work, then no disability exists.  *Id*. § 404.1520(e).  If the claimant cannot perform past relevant work, the Secretary has the burden to prove the fifth and final step by demonstrating that the claimant is able to perform other kinds of work.  *Id*. § 404.1520(f).  If the

13

1  Secretary cannot meet his or her burden at the fifth step, the claimant is entitled to disability benefits.
2  *Id*. § 404.1520(a).

3    In the instant case, there is no disagreement concerning the first three steps of the analysis.  The
4  parties disagree regarding the fourth and fifth steps of the analysis.  At the fourth step, the ALJ found
5  that Ms. Gallegos may have the residual functional capacity to perform her past relevant work as a
6  telephone operator.  (AR 29)  Regardless of whether she could perform her previous job, the ALJ found
7  at the fifth step that Ms. Gallegos had acquired skills as a telephone operator that were readily
8  transferrable to similar types of jobs that she could perform, given her residual functional capacity, and
9  for which there were a significant number of jobs available in the national economy.  (AR 29-30)  Ms.
10  Gallegos argues that the ALJ did not properly determine her residual functional capacity  (Plaintiff's
11  Motion for Reversal (#11), p. 21) and did not properly consider the treating physicians' records and
12  opinions.  *Id.* at 23.  Additionally, Ms. Gallegos argues that the ALJ's decision did not contain a proper
13  analysis of her credibility, and he discounted the credibility of her testimony regarding her symptoms on
14  the basis of a partial and biased review of the record.  *Id.* at 25.  Ms. Gallegos also argues that the ALJ's
15  decision did not contain a proper evaluation of the vocational expert testimony.  (Plaintiff's Motion for
16  Reversal (#11), p. 26).

17    **A.** **Medical Opinions of Treating and Non-Treating Physicians Regarding Residual Functional Capacity.**
18

19    A claimant's residual functional capacity assessment is a determination of what the claimant can
20  still do despite his or her physical, mental and other limitations.  *See* 20 C.F.R. §§ 404.1545(a),
21  416.945(a).  In determining a claimant's residual functional capacity, an ALJ must assess all the
22  evidence, including the claimant's and others' descriptions of limitation and medical records, to
23  determine what capacity the claimant has for work despite his or her impairment(s).  *Id.*  The ALJ
24  considers a claimant's ability to meet physical and mental demands, sensory requirements, and other
25  functions.  *See* 20 C.F.R. §§ 404.1545(b-d), 416.945(b-d).  Social Security regulations define residual
26  functional capacity as the "maximum degree to which the individual retains the capacity for sustained
27  performance of the physical-mental requirements of jobs."  20 C.F.R. § 404, Subpt. P, App. 2, §
28  200.00(c).  In evaluating whether a claimant satisfies the disability criteria, the Commissioner must

14

1   evaluate the claimant's "ability to work on a sustained basis."  20 C.F.R. §§ 404.1512(a), 416.912(a).

2   The ALJ gave substantial weight to the State agency examiner's September 3, 2004 assessment.

3   The ALJ stated that "in accordance with the guidelines in Social Security Ruling 96-6p, the residual

4   functional capacity assessment completed by the State agency and the findings of fact made by the State

5   agency and other program physicians regarding the nature and severity of the claimant's impairments

6   have been considered to be expert medical opinions of nonexamining sources."  (AR 26)  He further

7   stated that "this opinion is well supported by medically acceptable clinical and laboratory diagnostic

8   techniques and is not inconsistent with the other substantial evidence, and is therefore entitled to

9   substantial weight."  (AR 26-27)  Ms. Gallegos criticizes the ALJ's reliance on the State agency

10  examiner's assessment because it was not performed by a medical doctor and because it is inconsistent

11  with the opinions of her treating physicians whose opinions, contrary to the ALJ's determination,

12  should be accorded more weight.

13  The State agency examiner's assessment was based on Dr. Maningo's August 6, 2004

14  assessment and other records.  The key issue regarding Ms. Gallegos residual functional capacity was

15  her ability or inability to sit for a sufficient period of time in order to perform her duties as a telephone

16  operator.  The State agency examiner found that Ms. Gallegos was able to sit (with normal breaks)

17  about 6 hours in an 8 hour work day.  (AR 322)  The examiner stated that he reduced Ms. Gallegos

18  ability to stand and/or walk from 6 to 4 hours on account of her fibromyalgia history and her complaints

19  and obesity.  (AR 327)  The Government argues that the State agency examiner considered the effect of

20  Ms. Gallegos' fibromyalgia and other symptoms because he reduced Dr. Maningo's assessment

21  regarding the number of hours she could stand or walk.  There is no indication, however, that the

22  examiner reduced or modified Dr. Maningo's assessment regarding Ms. Gallegos' ability to sit for a

23  specified time period based on her fibromyalgia complaints.

24  Contrary to Ms. Gallegos' argument, the ALJ's decision indicates that he reviewed and

25  considered the medical evidence in the record.  *See* AR 23-26.  His summary of that evidence, however,

26  is not necessarily complete or accurate and some of the conclusions that he drew are not supported by

27  his own summary of the records.  The ALJ noted in his summary of the evidence that in a follow-up

28  visit after the surgery, Dr. McBride stated that the claimant may be able to return to work in March

15

1    2005.  The ALJ did not, however, mention that Dr. McBride also stated in his November 8, 2004 report

2    that if her the symptoms of severe pain and numbness in her legs when sitting go on, that perhaps a

3    fusion will ultimately need to be done at that level of spondylolithesis.  (AR 343)

4          In finding that the residual functional assessment of the State agency was entitled to more

5    weight than the opinions of the treating physicians, the ALJ stated:

6                The opinion submitted by Dr. Wingard that the claimant is unable to work
            is an opinion that is reserved for the Commissioner.  Additionally, his
7            opinion is not consistent with the overall medical record, which does not
            presently disclose impairments that would be expected to result in the
8            severe limitations assessed by him.  Dr. McBride opined in February 2005
            that the claimant *would* be able to return to work in March, and then
9            rescinded that opinion based solely on the subjective complaints of the
            claimant.  His opinion is not consistent with the objective medical record
10           and accordingly is not given full weight.  Dr. McBride suspected nerve
            entrapment was to blame for the claimant's symptoms, but testing in
11           November 2005 indicated there is no nerve entrapment.   (AR 27)
            (emphasis added)
12

13          As noted by the ALJ, the Social Security Administration is not bound by a treating physician's

14   ultimate opinion that a claimant is disabled because that ultimate determination is reserved for the

15   Commissioner.  In *Orn v. Astrue*, 495 F.2d 625, 631-32 (9th Cir. 2007), the Ninth Circuit discusses the

16   weight to be given to the opinions of treating physicians and non-treating examining physicians as

17   follows:

18               By rule, the Social Security Administration favors the opinion of a
            treating physician over non-treating physicians.  *See* 20 C.F.R. §
19           404.1527. If a treating physician's opinion is "well-supported by
            medically acceptable clinical and laboratory diagnostic techniques and is
20           not inconsistent with the other substantial evidence in [the] case record,
            [it will be given] controlling weight." *Id.*  § 404.1527(d)(2). If a treating
21           physician's opinion is not given "controlling weight" because it is not
            "well-supported" or because it is inconsistent with other substantial
22           evidence in the record, the Administration considers specified factors in
            determining the weight it will be given. Those factors include the
23           "[l]ength of the treatment relationship and the frequency of examination"
            by the treating physician; and the "nature and extent of the treatment
24           relationship" between the patient and the treating physician. *Id.* §
            404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians
25           are afforded more weight than those of non-examining physicians, and the
            opinions of examining non-treating physicians are afforded less weight
26           than those of treating physicians. *Id.* § 404.1527(d)(1)-(2). Additional
            factors relevant to evaluating any medical opinion, not limited to the
27           opinion of the treating physician, include the amount of relevant evidence
            that supports the opinion and the quality of the explanation provided; the
28           consistency of the medical opinion with the record as a whole; the

                                          16

specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. *Id.* § 404.1527(d)(3)-(6).

The Administration has explained § 404.1527 in Social Security Ruling 96-2p. That ruling provides, in relevant part:

[A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527.... In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. S.S.R. 96-2p at 4 (Cum. Ed.1996), *available at* 61 Fed.Reg. 34,490, 34,491 (July 2, 1996).

*Orn* further states:

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Lester* [*v. Chater,* 81 F.3d 821, 830 (9th Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Id.* (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* at 830, quoting *Murray v. Heckler,* 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes* [*v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989).] The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen,* 849 F.2d 418, 421-22 (9th Cir.1988).

*Id.* 495 F.3d at 632.

The medical records, as a whole, indicate that beginning in the latter part of November 2003, Ms. Gallegos began complaining of back and leg pain with shooting or radiating pain down her legs. From that point through October 2004, when she underwent lumbar spine surgery, her doctors continued to evaluate and treat her for these symptoms, which can generally be described as increasing. Dr. Maningo's and the State agency's residual functional capacity assessments occurred during this period, August and September 2004, respectively.  Dr. Maningo's report does not indicate whether he

17

1   reviewed any of Ms. Gallegos' medical records regarding the symptoms she was reporting up to the
2   date of his assessment.

3        Contrary to the ALJ's foregoing statement, Dr. McBride did not state in February 2005 that Ms.
4   Gallegos would be able to return to work in March 2005.  Rather, he stated that he advised Ms.
5   Gallegos' insurer in November 2004 that she may be able to return to work in March.  That statement
6   was made after Ms. Gallegos' initial post-surgical visit in which she reported significant improvement
7   in her condition 13 days after the operation.  His November 8, 2004 report also indicated, however, that
8   if her symptoms of severe pain and numbness in her legs continued, she might need a fusion operation.
9   There is, of course, a significant difference between a statement that the patient *will* be able to return to
10  work, versus a statement that she *may* be able to return to work if, as appears evident from Dr.
11  McBride's report, her condition continued to progress favorably.

12       In his February 5, 2005 follow-up report, Dr. McBride noted that Ms. Gallegos now reported
13  that her leg pain had become quite severe and was manifested by a burning sensation in the right leg
14  which was intermittent and mainly comes on after sitting.  (AR 341)  Dr. McBride stated that he
15  believed Ms. Gallegos had persistent sitting problems, that she had significant spondylolithesis, and she
16  may have instability that is brought on by sitting and standing.  He believed that this may cause her to
17  have intermittent nerve root entrapment despite decompression.  *Id.*  Dr. McBride further stated that
18  Ms. Gallegos was "certainly disabled from her customary work as a telephone operator until this gets
19  straightened out."  *Id.*  He further opined that if Ms. Gallegos continued to have limited sitting with
20  radiculopathy and is untreated, then she certainly cannot continue as a telephone operator, sitting for 7-
21  1/2 hours each day.  He declared her totally temporarily disabled until "we get this straightened out."
22  *Id.*  Thus, when the record is properly read in its entirety, Dr. McBride's opinions regarding Ms.
23  Gallegos' condition are not inconsistent.  His opinion in November 2004 that she may be able to return
24  to work in March 2005 was predicated on improvement or lack of worsening in her symptoms.  His
25  opinion in February 2005 that she was unable to work was based on her reported worsening symptoms.

26       Dr. Wingard's November 23, 2004 statement that Ms. Gallegos was "probably disabled for any
27  work" was consistent with Dr. McBride's subsequent opinion on February 5, 2005, although at the time
28  Dr. Wingard rendered his opinion, Ms. Gallegos' back and leg symptoms following surgery had not

1    clearly deteriorated.  Dr. Wingard's opinion was therefore entitled to less objective weight than Dr.

2    McBride's.

3            After March 5, 2005, Ms. Gallegos  continued to complain to Dr. Motos, Dr. Chaudhry and Dr.

4    Patel of back pain and radiating pain associated with sitting.  It is noteworthy that Ms. Gallegos was no

5    longer working and thus was not required to sit in one place for any extended period.  The Court also

6    recognizes that Ms. Gallegos was pursuing her claim for disability benefits and, thus, had an arguable

7    economic incentive to continue to make these subjective complaints.

8            As the ALJ noted in his decision, Dr. McBride suspected nerve entrapment was to blame for the

9    claimant's symptoms. Nerve conduction studies and EMG studies were finally performed on Ms.

10   Gallegos by Dr. Patel in November 2005.  (AR 369-372)  As the ALJ noted in his decision, this testing

11   indicated that there was no nerve entrapment, thus negating or, at least, contra-indicating Dr. McBride's

12   suspicion that nerve entrapment was the cause of her radiating symptoms.  The ALJ failed to note,

13   however, that Dr. Patel also stated "that the discomforting symptoms in her feet and legs may very well

14   be either from restless leg syndrome or fibromyalgia syndrome."  (AR 371)  It also appears indirectly

15   from Dr. Wingard's November 19, 2003 note that Dr. Mondell, who treated Ms. Gallegos' fibromyalgia

16   until November 2003, apparently believed that the onset of her back pain and leg symptoms were

17   related to fibromyalgia.  (AR 202)

18           In *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996), Judge Posner noted that fibromyalgia is a

19   common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares

20   a number of features.  Its symptoms are entirely subjective.  The court noted that fibromyalgia

21   symptoms are easy to fake, and it is difficult to determine the severity of a fibromyalgia patient's

22   condition because of the unavailability of objective clinical tests.  Because of the nature of this disease,

23   the Social Security Administration, and courts reviewing their decisions under the substantial evidence

24   standard, must carefully consider the circumstances relevant to the credibility of the patient's

25   complaints.

26            In this case, Dr. Patel was unable to ultimately find objective, clinical evidence that Ms.

27   Gallegos' radiating pain symptoms were caused by a nerve entrapment.  He did conclude, however, that

28   her symptoms may very well be due to restless leg syndrome or fibromyalgia.  Assuming that the

1   opinions of Dr. McBride and Dr. Wingard regarding the severity of Ms. Gallegos' symptoms are not

2   entitled to controlling weight because they are not well-supported by medically acceptable clinical and

3   laboratory diagnostic techniques, they are still entitled to deference and must be weighed using all of

4   the factors provided in 20 C.F.R. 404.1527. *Orn, supra.*  The ALJ was not entitled to reject their

5   opinions without providing "specific and legitimate reasons" supported by substantial evidence in the

6   record.

7          Here, the ALJ's rejection of their opinions appears to have been based on a misreading, or one

8   sided reading, of the medical records.  In particular, the ALJ cited only portions of Dr. McBride's

9   opinions and mischaracterized them.  In regard to Dr. Patel, the ALJ correctly noted his negative

10  findings regarding nerve entrapment, but failed to mention his conclusion that the symptoms were

11  attributable to restless leg syndrome or fibromyalgia.  This does not satisfy the standard required by *Orn*

12  and the cases cited therein.  Finally, of course, the ALJ was required to account for the subjective nature

13  of fibromyalgia symptoms.   In this case, he chiefly relied on the lack of credibility regarding Ms.

14  Gallegos' subjective complaints regarding the severity of her symptoms.

15         **C.    Credibility Determination.**

16         Ms. Gallegos also argues that the ALJ's decision does not contain a proper credibility analysis

17  regarding Ms. Gallegos' ability to engage in activities of daily living which he relied on in rejecting the

18  severity of her subjective symptoms.  The ALJ is responsible for determining credibility and resolving

19  conflicts in medical testimony.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Sample v.*

20  *Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  The court requires an explicit credibility finding

21  whenever the claimant's credibility is a critical factor in the Secretary's determination.  That finding

22  must be supported by a specific cogent reason for the disbelief and testimony may not be entirely

23  discounted simply because there was a lack of objective findings.  *Rashad v. Sullivan*, 903 F.2d 1229,

24  1231 (9th Cir. 1990).  As the Ninth Circuit stated in *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir.

25  1991), *citing Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986), the claimant is required to produce

26  evidence of an underlying impairment which is reasonably likely to be the cause of the alleged pain.

27  "When this evidence is produced, the *Cotton* standard does not require medical findings that support the

28  severity of pain and, thus, the adjudicator may not discredit the claimant's allegations of the severity of

1    pain on the ground that the allegations are unsupported by objective medical evidence." *Id.*

2          In evaluating whether subjective complaints are credible, the ALJ should first consider objective

3    medical evidence and then consider other factors. *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir.

4    1991) (en banc).  If there is objective medical evidence of an impairment, the ALJ then may consider

5    the nature of the symptoms alleged, including aggravating factors, medication, treatment and functional

6    restrictions.  *Id.* at 345-47.  The ALJ also may consider (1) the applicant's reputation for truthfulness,

7    prior inconsistent statements or other inconsistent testimony, (2) unexplained or inadequately explained

8    failure to seek treatment or to follow a prescribed course of treatment, and (3) the applicant's daily

9    activities.  *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th

10   Cir. 1996).  "Without affirmative evidence showing that the clamaint is malingering, the

11   Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing." *Morgan*

12   *v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

13         In this case, the ALJ found that Ms. Gallegos has pain causing functional limitations, but

14   concluded that her complaints were not fully persuasive.  (AR 27)  The ALJ found that Ms. Gallegos'

15   allegations that she is unable to do sedentary work due to chronic back and leg pain were

16   unsubstantiated, in part, because Ms. Gallegos reported to Dr. McBride that she was doing "a lot" of

17   walking shortly after her back surgery.  *Id.*  When the ALJ questioned Ms. Gallegos about Dr.

18   McBride's statement during the February 28, 2006 hearing, she replied that she did a lot of walking

19   after the surgery, as instructed, but denied that she ever walked several miles, and did not remember

20   telling Dr. McBride that she did so.  (AR 399)  Ms. Gallegos asserts that Dr. McBride misunderstood

21   her.  (AR 401)  The ALJ was entitled to consider this evidence in evaluating the credibility of Ms.

22   Gallegos' symptoms and testimony.  As indicated above, however, it does not appear that Dr. McBride

23   was convinced in November 2004 that Ms. Gallegos would experience a successful recovery from the

24   surgery.  He also accepted her statement in February 2005 that her symptoms had become more severe

25   and concluded that she was unable to work unless her back pain and radiating symptoms could be

26   successfully diagnosed and treated.  There was no indication that Dr. McBride or Ms. Gallegos' other

27   treating physicians believed that she was magnifying her pain symptoms or was malingering.

28   . . .

1    The ALJ also found that there were inconsistencies regarding Ms. Gallegos' limitations and

2    daily activities.  *Id.*  The ALJ stated that:

3          The claimant returned to Virginia to care for her uncle who has
      Alzheimer's Disease.  She sits with him during the day; she has flown

4          back and forth to Las Vegas several times; she continues to drive without
      restriction and has not obtained a handicapped permit.  The claimant

5          alleges inability to concentrate, yet the consultative psychological exam
      found only mild reduction in concentration and the claimant is able to

6          work on a computer without loss of concentration, including the filing of
      the application for Disability Insurance Benefits online.  The lack of

7          objective findings that would be expected to result in severe limitations,
      in addition to her continuation of the activities of daily living, is

8          inconsistent with the claimant's allegations of severe limitations.
      Consequently her complaints are not found to be fully persuasive and

9          have been given little weight.  (AR 27)

10   The Court agrees with Ms. Gallegos that the ALJ misstated her testimony regarding her

11   activities in key respects.  Contrary to the foregoing statement, Ms. Gallegos did not make "several"

12   trips between Las Vegas and Virginia.  She testified that she first traveled to Virginia in 2004 to care for

13   her uncle who had Alzheimer's disease, and then returned to Las Vegas several months later.

14   Thereafter, she returned to Virginia where she was still residing at the time of the hearing.  Ms.

15   Gallegos also indicated that she had not planned to return to Virginia.  However, he uncle became upset

16   about her leaving and she decided to return.  Secondly, the ALJ failed to note Ms. Gallegos' testimony

17   that the plane trips "killed her," that she made sure she got an aisle seat so that she could move around,

18   and that she used a wheelchair at the Las Vegas airport.  While non-essential air travel would be

19   inconsistent with the type of symptoms that Ms. Gallegos complained of, in this case her travel was for

20   purposes of assisting an ill relative.  Furthermore, she described these airplane trips as physically

21   painful and stated that she took measures to cope with the pain that she experienced from these trips.

22   The ALJ was obligated to fairly describe and assess the record regarding Ms. Gallegos' airplane travel

23   as it affected the credibility of her symptoms.  He did not do so.

24   The ALJ also discounted the credibility of Ms. Gallegos' symptoms based on her ability to

25   work on a computer, including the fact that she submitted her disability application on-line.  He failed

26   to note, however, that Ms. Gallegos testified that she could only sit at a computer for 15 minutes at a

27   time before her pain became bad and that she was only able to use the computer 2 hours a day total.

28   The ALJ also discounted the credibility of Ms. Gallegos' symptoms based on her ability to drive an

1   automobile.  He failed to mention her testimony that she drove only short distances and apparently went

2   out very little while residing in Virginia.  Dr. Maningo's report, however, provided some contradictory

3   evidence which arguably supported the ALJ's finding on driving.  Dr. Maningo noted that Ms. Gallegos

4   drove herself to the appointment at his office and he stated that she was able to drive long distances.

5   Ms. Gallegos was able to care for her personal hygiene and make her own meals and clean her own

6   dishes.  This latter testimony is not inconsistent with her complaints regarding her inability to sit for

7   significant periods.  Most of the facts cited by the ALJ in rejecting Ms. Gallegos' credibility regarding

8   the severity of her symptoms are not supported by a full and fair consideration of the record as a whole.

9   It appears that the ALJ reached his conclusions by only referencing those parts of the medical records or

10  testimony which discounted her credibility, while ignoring other parts which explained and supported

11  her complaints.

12          The record indicates that Ms. Gallegos did not suffer from a cognitive disorder.  If her pain

13  complaints are accepted as credible, however, they support the conclusion that she had and would have

14  difficulty performing the mental requirements of her job as a telephone operator because of pain and/or

15  medication.  The ALJ's decision to give little weight to Ms. Gallegos' pain complaints is not supported

16  by the record.  His decision to accord little or no weight to her testimony that she had mental or

17  cognitive problems in performing her job is therefore also not supported by the record.

18          **D.    Vocational Analysis.**

19          Where a claimant cannot perform her past relevant employment, the burden shifts to the

20  Commissioner at the fifth step to show that there are other available jobs in the national economy that

21  the claimant can perform.  In making the determination at the fifth step of the five-step analysis, the

22  ALJ may propound a hypothetical to a vocational expert that is based upon on medical assumptions

23  supported by substantial evidence in the record reflecting the claimant's limitations.  *See Roberts v.*

24  *Shalala*, 66 F.3d 179, 184 (9th Cir. 1995).  A vocational expert's testimony is reliable if the

25  hypothetical includes all of the physical limitations supported by the record.  *Thomas v. Barnhart*, 278

26  F.3d 947, 956 (9th Cir. 2002).  The ALJ can call upon a vocational expert to testify as to (1) what jobs

27  the claimant, given his or her residual functional capacity, would be able to do, and (2) the availability

28  of such jobs in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1011 (9th Cir. 1999).  The

23

1   ALJ's depiction of the claimant's disability must be accurate, detailed and supported by the medical

2   record.  *Id.*  The vocational expert then translates the factual scenario into realistic job market

3   probabilities by testimony on the record to what kinds of jobs the claimant can still perform and

4   whether there is a sufficient number of those jobs available in the claimant's region or in several other

5   regions of the economy.  *Id.*

6         In this case, the ALJ concluded at the fourth step that Ms. Gallegos had the residual functional

7   capacity to perform light or sedentary work and "may be able to perform her past relevant work as a

8   telephone operator for a long-distance company."  (AR 29)   The ALJ's equivocation in this finding was

9   apparently based on uncertainty whether her previous employer would accommodate her with sufficient

10  breaks to stand, walk around or lie down.  Ms. Gallegos testified that Sprint would not allow her to take

11  sufficient breaks. (AR 391)  The vocational expert ("VE") in this case, James Williams, testified that

12  Ms. Gallegos' previous employment as a telephone company directory assistance operator was semi-

13  skilled work which was classified as sedentary for exertional work.  (AR 410)  He testified that the

14  skills from this work were transferrable to other similar sedentary jobs.  He identified jobs as a

15  telephone answering service operator.  *Id.*  He testified that the positions of directory assistance operator

16  and telephone answering service operator basically require the ability to operate the equipment and deal

17  with the public.  The employee has to be able to communicate and articulate information and to relate to

18  customers.  The employee also has to be diplomatic and handle complaints to some degree.  (AR 410-

19  411)

20        The ALJ asked the VE to assume a hypothetical individual, the same age, education and past

21  work experience as Ms. Gallegos who had the following residual functional capacity:

22          [C]an occasionally lift and/or carry including upper pulling up to 20
            pounds; frequently lift and/or carry including upper pulling up to ten
23          pounds; stand and/or walk with normal breaks for a total of about four
            hours in an eight hour day; sit with normal breaks for a total of about six
24          hours in an eight hour day; can frequently climb ramps, stairs, should
            never climb ladders, ropes or scaffolds; can frequently balance, stoop,
25          kneel, crouch, crawl.  I'm going to add that on the specific issue, avoid
            working around hazards such as dangerous machinery or (INAUDIBLE).
26          I think that I've described a range of sedentary work?  (AR 411-412)

27        The ALJ asked the VE whether a person who had a past relevant job as a directory assistance

28  operator could perform that job with the limitations described above.  The VE responded yes.  (AR 412)

24

1   The ALJ further confirmed that the VE had heard Ms. Gallegos' testimony that due to pain she needs to

2   get up, move around and even lay down during the day.  He asked whether that is typically

3   accommodated in a job such as a directory assistance operator or in other work.  The VE responded that

4   normally, if someone has to stand up or lay down, it goes to the frequency and duration, "we look at is

5   (sic) a combination."  (AR 412)  The ALJ thereupon added the following restrictions to his hypothetical

6   – that the person needs a sit/stand option, either sitting or standing or standing and sitting, once every

7   hour.  The VE responded as follows:

8               It would be my opinion that it probably be governed by the employer but
             the, in my (INAUDIBLE) to erode some of the numbers with a sit/stand
9               option, but in most cases, there is a, some tolerance with a person to sit
             versus standing during an hour period.  I think that's viewed as consistent
10              with the testimony.   (AR 413)

11          The VE further testified that there are a lot of base jobs like telephone solicitors where the

12   employers would allow employees to sit and stand during the day.  Some employers are more liberal

13   than others.  He indicated that this would depend on the work setting and how the equipment is set up.

14   (AR 413)  Assuming that the employee's need to sit/stand could be accommodated, the VE testified that

15   there are jobs such as central office operators, telephone operators, long distance assistance operators,

16   and long distance call operators and answering service operators.  The VE testified that there are

17   236,000 jobs nationally in this category in which  employees work all different types of hours.  He

18   again testified "There is a, possibility of sit and stand but again, its going to go back to the, the specific

19   company." (AR 414)   In response to the ALJ's request for an estimate of how many of "the 236,000

20   national numbers" would allow the sit/stand option, the VE testified that it was his opinion that

21   probably 40 percent would provide a sit/stand option.  (AR 414)  He also testified that there were

22   128,000 telemarketer jobs in the national economy in 2004-2005.  In regard to what percentage of those

23   jobs would allow the sit/stand option, the VE estimated that 30 to 40 percent would provide this option.

24          Ms. Gallegos' attorney asked the VE whether his opinion or estimate would be affected if the

25   person has an impaired ability to concentrate.  The VE testified that he would again look at ability and

26   the frequency and duration.  He further stated:

27              I would want to know what the details were, is this something that they
             would be off task 50 percent of the time.  If it goes into that, then you
28              start looking at whether the impairments are moderate or whether they're

25

1     severe and then you have to look at the abilities, you know, same thing.
Being productive, the bottom line, is just being productive.  (AR 417)

2

3   In his decision, the ALJ summarized the vocational expert's testimony as follows:

4     Given the claimant's age, education, work history, and residual functional
capacity, Mr. Williams further testified that there are other jobs, which
the claimant could do.  Examples of such jobs are:  telephone operator at

5     an answering service, of which there are 236,000 jobs nationally; or
telephone solicitor or telemarketer, of which there are 428,000 jobs

6     nationally.  The vocational expert further stated that, if the claimant was
allowed to sit or stand at her election, there would only be a 40%

7     reduction in the number of jobs available. (AR 28)

8   The ALJ reiterated this statement in his findings.  (AR 30)

9    The ALJ's description misstated the VE's testimony in two respects.  First, as pointed out by

10 Ms. Gallegos' attorney, the VE did not testify that there would only be a 40% reduction in the number

11 of jobs available based on Ms. Gallegos' need for a sit/stand option.  Rather, he testified that only 40

12 percent of the 236,000 telephone operator/answering service operator jobs would provide a sit/stand

13 option.  Secondly, the VE testified that there were 128,000, not 428,000, telephone solicitor/

14 telemarketer jobs in the national economy, and that only 30 to 40 percent of those would provide a

15 sit/stand option.

16    The importance of the ALJ's errors in describing the VE's foregoing testimony is unclear.  If the

17 ALJ had correctly interpreted the VE's testimony, then there were 84,400 (40% of 236,000) telephone

18 operator/answering service operator jobs and 38,400 (30% of 128,000) telephone solicitor/telemarketer

19 jobs, in which some form of sit/stand option is provided.   The statute provides that "'work which exists

20 in the national economy' means work which exists in signficant numbers either in the region where

21 such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)*.  See also* 20 C.F.R.

22 §404.1566.  Assuming that the hypothetical correctly described Ms. Gallegos' residual functional

23 capacity, the existence of 84,400 and 38,400 jobs in the national economy that Ms. Gallegos could

24 perform, may have been sufficient to support the ALJ's decision at the fifth step.

25    The ALJ's decision also characterized the VE as stating that the available jobs would permit the

26 claimant *to sit or stand at her election*.  (AR 28)  It is unclear what the ALJ meant by this statement.

27 The ALJ stated in his hypothetical that the person would need to be able to either sit or stand, or stand

28 and sit, once every hour.  (AR 412)  It was in response to this hypothetical that the VE gave his

1   estimate.  Even then, the VE qualified his estimates by stating that accommodation for this requirement

2   would vary from employer to employer and would depend on frequency and duration.  The difference

3   between the VE's testimony and how the ALJ characterized it in his decision is significant.

4          Ms. Gallegos testified at the hearing that, normally, she could sit between a half hour and an

5   hour and that it depends on how she is feeling on that day.  (AR 394)  She also testified that since she

6   ceased working, she also usually has to lie down a couple of times if possible.  (AR 391)  She also

7   testified that she can only stand up for 15 minutes, possibly a half hour if it is a good day.  (AR 398)

8   She similarly reported to Dr. Maningo in August 2004 that she could not sit in a chair more than 30

9   minutes and could not stand on her feet for more than 15 minutes. (AR 272)  She also testified at the

10  hearing that she can only sit at her computer for 15 minutes at a time before her pain becomes bad.  (AR

11  405)  The ALJ rejected the credibility of Ms. Gallegos' testimony in concluding that she had the

12  capacity to regularly sit for one hour before taking a break.  As indicated above, however, the ALJ did

13  not properly consider the record as a whole in rejecting the credibility of her testimony.  This, in turn,

14  diminishes the basis for his reliance on the VE's testimony that Ms. Gallegos could perform other jobs

15  in the national economy that permit employees to take hourly breaks.  There is also no indication to

16  what degree, if any, the ALJ considered the impact that Ms. Gallegos' pain, itching, medications  and

17  sleep problems would have on her ability to concentrate and perform her job duties even if she was

18  allowed to take one hour breaks to stand or walk around.

19          **II.     Whether This Case Should Be Remanded For An Award of Benefits Or For**
            **Further Determination Regarding Whether Plaintiff Is Disabled.**
20

21          Based on the foregoing, the Court concludes that the ALJ's April 28, 2006 decision, which was

22  affirmed by the Appeals Council, is not supported by substantial evidence and should be remanded to

23  the Commissioner.  The next issue is whether the claim should be remanded for an award of benefits or

24  further hearing and determination by the Commissioner, based on a proper evaluation of the record as

25  to whether Ms. Gallegos is disabled.  In *Lingenfelter v. Astrue*, 504 F.3d 1028,1045-46 (9th Cir. 2007),

26  the court states that where the medical opinions of the clamant's treating physicians are contradicted by

27  another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons

28  for doing so that are supported by substantial evidence in the record.  Where the ALJ and the Appeals

1   Council fail this test, the case should be remanded to the agency for proper consideration of the

2   evidence.  *Lingenfelter* further states that under the test in *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th

3   Cir. 1996), the district court should credit evidence and testimony that was rejected during the

4   administrative process and remand for an immediate award of benefits where:

5                    (1) the ALJ has failed to provide legally sufficient reasons for rejecting
                     such evidence, (2) there are no outstanding issues that must be resolved
6                    before a determination of disability can be made, and (3) it is clear from
                     the record that the ALJ would be required to find the claimant disabled
7                    were such evidence credited.

8           *Lingenfelter* further states that "[w]e have generally applied the *Smolen* test only in cases where

9   the evidence in the record strongly supports a finding of disability.  *See, e.g. Benecke v. Barnhart*, 379

10  F.3d 587, 595 (9th Cir. 2004) ... (additional citations omitted.)."  *Id.* at 1046.  The court further noted

11  that even in cases where the *Smolen* test applies, the court has discretion in such cases to remand the

12  case to the agency to make further credibility determinations.  *Id.*

13          In this case, the issues involved Ms. Gallegos' ability or inability to sit for a sufficient period of

14  time in order to be able to perform her previous employment as an operator for a telephone company or

15  other similar employment where she may be given more frequent opportunities to stand or walk around

16  or lie down during the workday.  The determination also requires a consideration whether Plaintiff's

17  pain, other symptoms and/or medication adversely affect her cognitive or mental ability to perform the

18  work tasks even if she is allowed to take more frequent breaks.

19          There was conflict in the medical evidence between Plaintiff's treating physicians, Drs.

20  McBride, Wingard and Patel, and the non-treating/examining physician, Dr. Maningo and the non-

21  treating/non-examining State agency examiner/physician regarding Plaintiff's ability to sit for a

22  sufficient period of time in order to perform such jobs.  Although Dr. McBride and Dr. Wingard stated

23  that Ms. Gallegos was completely disabled from her previous employment due to the sitting

24  requirement, their reports did not specifically address her ability to perform a similar job if she was

25  afforded sufficient breaks to stand or walk during the workday.  Because this issue was not addressed

26  by any of the physicians, this issue remains outstanding and remand for further determination is proper.

27  From the records provided, it also appears that Plaintiff's ongoing symptoms of back and radiating leg

28  pain after her back surgery were likely attributable to her fibromyalgia and/or restless leg syndrome, the

28

1  diagnosis and severity of which is dependent on the Plaintiff's subjective complaints and symptoms.
2  While the ALJ erred in giving little weight to Ms. Gallegos' testimony regarding the severity of her
3  symptoms, the record also indicates that she is able to take care of her personal hygiene, cook and clean
4  for herself and drive an automobile at least for short distances.  In addition, she testified that she was
5  able to sit between 30 minutes and an hour.   On this record, therefore, the Court cannot state that the
6  evidence in the record strongly supports a finding of disability.  *Lingenfelter, supra.*  The Court,
7  therefore, concludes that this case should be remanded to the Social Security Administration for a
8  determination whether Ms. Gallegos is disabled based on the record as a whole.

9  **CONCLUSION**

10      For the foregoing reasons, the Court finds that ALJ's finding that Ms. Gallegos is not disabled is
11  not supported by substantial evidence in the record.  The medical evidence and testimony justify a
12  remand of this case to the Commissioner for a further hearing and a determination of disability based on
13  a proper evaluation of the record as a whole.  Accordingly,

14      **IT IS HEREBY RECOMMENDED** that Plaintiff 's Motion for Reversal (#11) be **granted**
15  and that this case be remanded to the Commissioner for a further hearing and determination of whether
16  Plaintiff is disabled based on a proper evaluation of the record as a whole, including giving due weight
17  to the medical opinions of the Plaintiff's treating physicians, a proper assessment and crediting of Ms.
18  Gallegos' testimony regarding her symptoms and limitations, and a proper assessment and evaluation of
19  the vocational expert testimony regarding the availability of other jobs in the national economy that
20  Plaintiff can perform.

21      **IT IS FURTHER RECOMMENDED** that Defendant's Motion to Affirm (#16) should be
22  **denied**.

23  **NOTICE**

24      Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in
25  writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the
26  courts of appeal may determine that an appeal has been waived due to the failure to file objections
27  within the specified time.  *Thomas v. Arn*, 474 U.S 140, 142 (1985).  This circuit has also held that (1)
28  failure to file objections within the specified time and (2) failure to properly address and brief the

29

objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 9th day of September, 2008.

**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**